202 So.2d 59

**James CARR**

v.

**STATE.**

**4 Div. 581.**

Court of Appeals of Alabama.

May 23, 1967.

Rehearing Denied June 20, 1967.

See also 43 Ala.App. 64, 179 So.2d 773.

John C. Walters, Troy, and W. R. Martin, Ozark, for appellant.

MacDonald Gallion, Atty. Gen., and Walter S. Turner, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Following a mistrial, appellant was tried and convicted of robbery and sentenced to a term of ten years in the State penitentiary. Ater a motion for new trial was denied, he perfected this appeal.

Mr. Loyd Beasley was severely beaten and robbed of approximately $2,000.00 in cash between 10:00 and 11:00 P.M. on the night of December 14, 1963. He had just entered his garage and gotten out of his car when he was struck four times with a "piece of iron". He managed to get into his house and police were summoned. He died from other, unrelated causes on August 25, 1965 as shown by the testimony of his step-mother, Mrs. Olive Beasley. After a proper predicate was laid by testimony of the official court reporter, the official transcript of the testimony of Mr. Beasley from the first trial of this case in June of 1964 was read into evidence over appellant's objection. The testimony stated in part that, though mentally confused and without memory of the events concerning the robbery at first, in March of 1964 Beasley recalled by a "return of memory" the incident and named appellant as his assailant. The testimony was as follows:

"Q. Mr. Beasley, as he struck you and turned you around, did you recognize your assailant?

"A. Yes, sir.

"Q. Who was that assailant?

"A. James Carr.
 *     *     *     *     *     *
"Q. All right, sir. During the time you were in the hospital were you asked questions about this particular robbery?

"A. Yes.

"Q. Did you recall at that time who had attacked you?

"A. No, sir.

"Q. Did you recall all the facts connected with this robbery at that time?

"A. No, sir. Not at that time, no.
 *     *     *     *     *     *
"Q. During that period of time were you completely aware of all the circumstances that you are now aware of concerning this robbery?

"A. No, no.

"Q. Mr. Beasley, I will ask you when you first realized or knew positively who had attacked you?

"A. That was about around, I wouldn't say the date exactly, but it was in March. I don't know whether it was the middle of March, the first or what, but it was in March.
 *     *     *     *     *     *
"Q. Mr. Beasley, are you certain of your recognition of this man, James T. Carr, on the night of December 14th, 1963?

"A. Definite.

"Q. And the back yard was fully illuminated?

"A. Yes, sir."

Appellant's counsel, the same attorney at both trials, then had read the cross-examination of Beasley. Beasley stated that he had loaned appellant $20.00 on an occasion prior to the robbery at which time

he had produced a roll of bills in the presence of appellant.

Dr. Robert F. Zumstein next testified for the State. He stated that he attended Beasley immediately following the incident and again when Beasley returned home from the hospital. He described Beasley's condition when he was first called as "mentally confused"; and stated that Beasley had "five or six gashes or holes in the head". Besides the four fractures of the skull, Beasley also had had his hand broken in two or three places attempting to ward off the blows. Dr. Zumstein stated that the head fractures were "severe" and "splinter type" fractures; that from Beasley's symptoms and urological findings, "it was almost certain that he had internal injuries of the brain". Dr. Zumstein also stated that Beasley had developed a speech impediment and loss of balance (Ataxia); that he was suffering from amnesia, which caused a loss of memory "for a period of time, which would return later"; and that amnesia was a common symptom of this type of injury; but the doctor could not say positively that Beasley had amnesia, only that "he did not remember events". Speaking of the time the memory might return, Dr. Zumstein testified as follows:

"A. Well, I don't know exactly when I saw Loyd, the dates, the exact dates, but I was probably checking him every two or three weeks there in the middle of April, I got around to seeing Loyd, and at that time his neurological complaint was atoxia, loss of balance, and his speech impediment had cleared remarkably, and I believe at that time he said he could remember things better, he could remember things probably a month before that he could not * * * could not remember, I asked him specifically if he could remember events during these examinations and he did not up until that time. :

"Q. You say this was in April?

"A. In April. ·

"Q. And the injury occurred of course in December?

"A. December.

"Q. Of 1963?

"A. Yes."

Dr. Zumstein also stated that amnesia need not be complete loss of memory, but might be partial and in "varying degrees", depending upon the type of injury. He said that he felt that Beasley had in fact recovered at the time he named appellant as his assailant. On cross-examination the doctor testified that blows such as Beasley had received might possibly disorientate him to the point where he might name the wrong person, but not make him more open to suggestion about this than a normal person:

"Q. Doctor, as to loss of memory that you are speaking of the amnesia that you have spoken of; isn't it medically possible that the memory or what he thought was the memory returned to him could be the incorrect memory and yet he would think it right?

"A. Yes, sir. I think that would be correct.

"Q. And that is entirely medically possible, isn't it?

"A. I feel like it is."

■ We feel that the weight and credibility of the testimony of the witness Beasley was a jury question.

Several character witnesses testified on behalf of appellant, all stating that his general reputation in the community was good. On cross-examination each also stated that a period of years had elapsed since they had known appellant intimately.

Appellant testified in his own behalf, stating that he not only did not see a roll of bills when he borrowed $20.00 from Beasley, but he did not even know where the Beasley garage was located in proximi-

ty to the rest of the home. Appellant stated that on the night of the robbery he was driven by Gerald Brown in Brown's car in search of Bogan Senn to sell him 25 gallons of whiskey which appellant had hidden. He stated that he and Brown failed to locate Senn at his home and finally did locate him by telephone from Kenny's Truck Stop. Appellant agreed to meet Senn in front of the Ariton Holiness Church, also known as the Assembly of God Church. As appellant and Brown drove away from the truck stop, they were stopped and given a warning ticket by a state trooper for speeding. Brown dropped appellant at the church and appellant sold the whiskey to Senn. Brown returned an hour to an hour and a half later with his wife and appellant's wife at about 9:30 P. M. They bought beer and then stayed the night at the Goff Motel outside of Ozark, Alabama.

Appellant stated that the money he had was as follows: $300.00 from the sale of 30 gallons of whiskey; $230.00 for 25 gallons sold to Senn (short changed $20.00); $32.00 for a roofing job on a church; also his wife's salary. He stated that the down payment on a trailer ($137.00) was returned. Appellant put money down on various pieces of furniture and this was from a $300.00 cashier's check bought in Florida. He stated that he knew nothing about the robbery until the following afternoon.

Mr. Robert (Tony) Masters, a State investigator, testified that he interrogated appellant after his arrest, at the Dale County jail. Masters stated that he told appellant at the beginning of each interrogation period, and prior to the actual questioning, that he offered no reward, made no threats, and told appellant that he need not say anything and that anything he said might be held against him. He testified that appellant stated that the $300.00 cashier's check was borrowed money from an uncle in Florida. Masters stated that he was one of the men who later accompanied appellant on the trip to Montgomery, Ala-

bama, to take a lie detector test, and that he knew appellant had employed an attorney. Masters also testified that the "boy who operates the polygraph machine" questioned appellant and "I questioned him some while he was there". Masters' testimony concerning the lie detector test was brought on rebuttal and was elicited by appellant's counsel *during cross-examination* of Mr. Masters. At no other time during the trial was there a mention of the lie detector episode or information gathered incident thereto, and no evidence so derived was introduced into evidence by the State. The State's case was built upon the testimony of deceased, Mr. Beasley, and Dr. Zumstein. After their testimony, the State rested without reference to or mention of the lie detector test.

Mr. D. L. Chestnut was called as a witness by appellant. He testified that he telephoned appellant's attorney with regard to the taking of appellant to Montgomery for a lie detector test and stated in part as follows:

"Q. Mr. Chestnut, what was the substance of your call to me, and the purpose of it?

"A. I called you in regards to taking Mr. Carr to Montgomery to put on the lie detector machine up there.

"Q. Do you remember my reply to you?

"A. I do.

"A. What was it?

"A. You told me you would agree to it if they would give you a copy of it.

"Q. Then what did you do?

"A. I turned to the one that was in the office, which one it was I don't remember, because they was several in the office, and asked them would they give you one; they was several going up there, and they said that they would, and I told you then that they would. And you agreed for him to go.

"Q. For him to go?

"A. That is right."

At the close of testimony, appellant moved to exclude Masters' testimony about the receipt of money from appellant's uncle, which request was denied. He then moved to exclude the statements of Loyd Beasley to the sheriff and to Dr. Zumstein and Mr. Woods, which request was also denied. Finally, appellant moved for a mistrial on the argument of a "fine" paid by appellant to the Circuit Court. This also was denied.

■ Appellant contends that the testimony of Mr. Beasley, the deceased, at the prior trial should be excluded for the reasons that it was not shown to be sworn testimony, that there was no opportunity to confront the witness and that the cross-examination was insufficient. We cannot agree with this. The record clearly states, "after being first duly sworn", and it reflects that these were the same issues and parties, and that there was confrontation and adequate cross-examination at the first trial. We think this sufficient, as a proper predicate was laid for its introduction. Levert v. State, 225 Ala. 214, 142 So. 34. Appellant's claims have no merit. See also E. E. Yarbrough Turpentine Co. v. Taylor, 201 Ala. 434, 78 So. 812; Marler v. State, 67 Ala. 55; Dupree v. State, 33 Ala. 380; Wray v. State, 154 Ala. 36, 45 So. 697, 15 L.R.A.,N.S., 493; Wyatt v. State, 35 Ala. App. 147, 46 So.2d 837, cert. den. 254 Ala. 74, 46 So.2d 847; Wellden v. Roberts, 37 Ala.App. 1, 67 So.2d 69, cert. den. 259 Ala. 517, 67 So.2d 75.

■ We think appellant's contention that he was convicted based upon "conjecture, surmise or suspicion" has no merit.

■ The mentioning by the solicitor in his closing argument to the jury of "Thou shalt not kill" was cured adequately by the court. Appellant objected and moved for a mistrial at this point. The court, however-

er, denied the motion and made the following remark which cured any injury or prejudice to appellant:

"COURT: Gentlemen, the defendant has made an objection to the reference Mr. Woods made 'Thou shalt not kill.' I instruct you to disregard that, because there is no question of homicide involved for your consideration in this case."

For this reason, we feel that no reversible error was here committed, and, if error, its correction adequately removed it from the province of the jury.

■ Appellant strongly contends that his rights were violated by his having no lawyer present at the lie detector interrogation. It is true that the case of Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70, states the principle that the right to counsel is a constitutional right and failure of appellant to ask for counsel is not a waiver of this right. In the case at bar, however, appellant's counsel was contacted by telephone before any action was taken by the State. Said counsel waived his right to be present at the lie detector session by stating that it was "alright" to take appellant on the trip to Montgomery for this test, his only stipulation being that he be furnished with a copy of the results.

Appellant contends that under the doctrine of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, he was entitled to have his attorney present at all questionings. The case of Mathis v. State, 280 Ala. 16, 189 So.2d 564, construes *Escobedo* in Alabama cases and states in part as follows:

"Defendant's voluntary inculpatory statements to police were admissible in trial governed by Escobedo but not by Miranda, although defendant was not represented by counsel, where it did not appear that lawyer had been excluded or that he had requested a lawyer or anyone else.

\*     \*     \*     \*     \*     \*

"The fact that Mathis was not represented by counsel when he made the inculpatory statements did not, of itself, render the statements inadmissible. See: Lokos v. State, 278 Ala. 586, 179 So.2d 714; Sanders v. State, 278 Ala. 453, 179 So.2d 35."

Appellant's counsel was not excluded at all, but was specifically telephoned and informed. By his own statements to Mr. Chestnut, he in effect said to go ahead and send him a copy of any results. True, he did not waive his right to be present at any other interrogation besides a lie detector test, but nothing from this session was introduced into evidence against appellant, and at no other time was this question of exclusion of counsel brought up by appellant.

This cause is therefore due to be and the same is hereby.

Affirmed.

PRICE, P. J., and CATES, J., concur in judgment of affirmance only.